ADAM GORDON
United States Attorney
SIDDHARTH DADHICH
Assistant U.S. Attorney
Texas Bar No.: 24096310
Office of the U.S. Attorney
880 Front Street
San Diego, CA 92101
Tel: (619) 546-9721
Email: Siddharth.Dadhich@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> JAIME ERNESTO ALVAREZ-GONZALEZ, <br><br> Defendant. | Case No.:26-mj-01355-SBC <br><br> **Detention Memo** <br><br> March 17, 2026 <br> 1:30 PM |

The UNITED STATES OF AMERICA, by and through its counsel, Adam Gordon, United States Attorney, and Siddharth Dadhich, Assistant United States Attorney, hereby files this detention memo in the above-captioned case.[1]  This matter is set for a detention hearing on March 17, 2026.  This case presents a multi-district investigation: Defendant is being investigated by the Southern District of Texas for separate firearms charges.

This memo seeks to clarify the reasons why detention is appropriate given that Defendant previously received bond in Case No. 26-CR-0049.  That case involves only a single charge for 18 U.S.C. Section 912 (false personation of a federal officer).

---

[1] Government counsel will relay the key facts of this memo to the Court at the detention hearing.

Defendant is currently detained pursuant to parallel immigration proceedings and charged by a separate three count complaint in this case.

## I.    FACTS SUPPORTING THE DETENTION HEARING ON THE SECTION 912 OFFENSE

On February 6, 2026, Magistrate Judge Leshner released Defendant on a $30,000 bond secured by the signature of one financially responsible, related adult and a $3,000 cash deposit (over the government's motion to detain).  At the time, Defendant was only charged with the 18 U.S.C. Section 912 offense (false personation of a federal officer).  At that hearing, the government argued that Defendant posed a flight risk and had already successfully destroyed evidence of the 912 offense. Since then, there has been significant investigative and factual development that led to the 18 U.S.C. Section 922(g)(5) firearms charge and the 18 U.S.C. Section 1546(a) charges.

To government briefly summarizes the facts proffered in the prior detention hearing, which this Court may consider in relation to the history and characteristics analysis under 18 U.S.C. Section 3142(g).

On January 8, 2026, at approximately 8:30 AM, Supervisory Border Patrol Agent (SBPA) Luis A. Bedolla was assigned to Immigration and Customs Enforcement (ICE) to assist in fugitive targeting and apprehension operations in the San Diego area, which is within the Southern District of California.

While conducting an ICE operation in the Linda Vista area and traveling on surface streets, SBPA Bedolla noted a black, Ford F-150 following his vehicle closely. The F-150, bearing license plate No. "JV47N" was driven by and registered to Defendant.  SBPA Bedolla noted the vehicle had handcuffs hanging from the rear-view mirrors, communication antennas located on the roof, and a light bar placed against the front windshield—typical of unmarked or low-profile vehicles.  Below are images of Defendant's Ford F-150.  The handcuffs and low-profile lights are circled in red.



Notably, and as shown in the image below, the F-150 driven by Defendant had United States Border Patrol insignia affixed to the front windshield of the vehicle. In addition, Defendant's vehicle had a silver license plate frame that stated "FERDERAL TRUCK" [sic]. Both license plates included a graphic that stated, "Sheriff's Association of Texas."





3



Based on his observations, SBPA Bedolla believed the F-150 was being used by a legitimate federal law enforcement officer.  As a result, SBPA Bedolla began working to deconflict the vehicle with fellow law enforcement to check whether the individual following him was a federal law enforcement officer operating in SBPA Bedolla's vicinity (and unknown to him).

Communications intercepted and translated by law enforcement show that Defendant recorded and narrated nearly this entire incident.  On that recording, he claimed to be on "patrol."  He identified SBPA Bedolla as a suspicious vehicle and continued to follow him.

Defendant followed SBPA Bedolla, narrating his movements in real time.  At one point, Defendant pulled his vehicle next to SBPA Bedolla at a stop light and pulled out his phone to record him.  SBPA Bedolla next turned into a gas station from the right turn lane to test whether Defendant would continue to follow him and whether he was actually legitimate law enforcement.  Around this time, SBPA Bedolla, concerned with his safety, called for assistance.

Defendant followed SBPA Bedolla into the gas station parking lot, taking a turn into the lot from the left-hand turn lane and cutting over the median lane.  Defendant exclaimed, on the recording, that he would stay on his target (SBPA Bedolla) and follow

him.   Later, using coded language, Defendant confirmed that he knew that SBPA Bedolla was involved in law enforcement activity.

Due to Defendant's persistent following of SBPA Bedolla's vehicle, SBPA Bedolla was forced to abandon his law enforcement mission.  SBPA Bedolla called for backup, and he and another officer confronted Defendant in a parking lot nearby Defendant's business.  Defendant was wearing a thin green line hat commonly used to show support for border patrol and a facemask commonly worn by federal agents on interior operations.   Defendant caused a public commotion and aggressively told officers to leave his community.  The federal officers departed the scene and were chased by three additional vehicles on the highway which Defendant labeled his "reinforcements."



About a week later, on January 14, 2026, Defendant was arrested and detained on immigration charges.  He was driving a blue Tesla vehicle with a visible FBI hat on the window and another lightbar.  On his person was a badge that appeared to have an FBI sticker placed on the card, appearing as an FBI PIV card.





6

On January 15, 2026, while Defendant remained in immigration custody, ERO Deportation Officer Ana Padilla reported hearing a telephone conversation between Defendant and an individual believed to be Defendant's romantic partner while Defendant was in detention.  In that conversation Defendant requested his personal effects be extracted from ERO custody and that law enforcement indicators in and on the vehicles associated with him be removed.

On January 16, 2026, law enforcement searched both vehicles associated with Defendant.  Law enforcement confirmed that nearly all evidence of law enforcement impersonation previously identified from external photos of the vehicle had been removed (including a United States Border Patrol sticker that appears scratched off).  Agents found a lightbar in the backseat of the Ford F-150 driven by Defendant on the day of the incident.  Based on the phone call overheard by DO Padilla and the subsequent search of the vehicles, agents believe that Defendant instructed an individual to remove evidence from those vehicles, which further demonstrates his consciousness of guilt.



*Photograph Taken of Target Vehicle 1 on Day of January 8, 2026, Incident*



*Photograph Taken of Target Vehicle 1 on January 16, 2026*

A search of Defendant's home revealed body armor plates and additional law enforcement paraphernalia, including a CBP "no trespassing" sign that appeared to have been stolen from its original location.

  



Defendant has posted multiple pictures online which appear to show him as a border patrol agent.

 

## II.   NEW FACTS BEFORE THIS COURT

As noted in the complaint filed in this matter, the government did not know about Defendant's possession of firearms until after the initial detention hearing before Judge Leshner or the extent of Defendant's misrepresentations. Those facts are covered in depth in the criminal complaint lodged with this Court.  At bottom, there is a significant change in position that justifies detention in this case for both a serious risk of flight and a danger to the community (by the preponderance and clear and convincing standard, respectively).

### A. Defendant's Immigration Status has Changed: He Now Willingly Seeks Removal from the United States

When Defendant appeared before Judge Leshner on the 18 U.S.C. Section 912 offense on February 6, 2026, the undersigned's understanding was that he was still in contested removal proceedings, including fighting for release for detention.

This posture has completely changed.  Defendant filed a motion on March 2, 2026, through counsel in which he (1) withdrew his only pending application for relief,

and (2) admitted all factual allegations underlying the sole charge of removability. Bottom line: Defendant wants to be removed from the United States, and the United States Attorney's Office wants to keep him here.

Defendant is a citizen of Mexico. He has no status in the United States and has abandoned his I-485 adjustment application. Defendant's lacks the legal status to work in the United States. Defendant was last given a work permit in 2024. This permit is revoked/canceled as of the administrative closing of his pending application and is not evidence of lawful status. The government is moving to detain him so he may be tried on the offenses charged against him. Defendant seeks to leave the country, and unlike a grant of voluntary departure—which Defendant previously pursued—he would be eligible for prosecution on a 18 U.S.C. Section 1326 felony if he decided to re-enter the United States.

Defendant was married in Mexico in 1998. Based on divorce documents (effectuated in 2023) that were provided by the Defendant in immigration proceedings, he owns property in Jalisco and Tapachula. Although he has family in the United States, he is consenting to removal, all but ensuring that any return will be in violation of United States immigration law.

Defendant's change in immigration status poses a significant risk of flight if he is released on these criminal charges (and is paroled into the United States).

**B. Defendant has repeatedly lied to United States' Officials and on ATF Transaction Records and Cannot Be Trusted to Appear for Court or Follow Court Orders**

As charged in the complaint in this case, Defendant repeatedly lied on his 1-485 form which is necessary to adjust his status. That was a process Defendant himself initiated. He was represented by counsel and signed the form under penalty of perjury on January 16, 2024. Defendant also swore to the truth of his answers on his I-485 on January 29, 2025 in an interview with a USCIS Task Force officer.

Defendant's first charged lie from the I-485 is whether he was "arrested, cited, charged, or detained for any reason by any law enforcement official." Defendant said

no, but that's not true.   Defendant was arrested in 2019 for being possession of misbranded drugs and pharmaceuticals.  This investigation was a product of controlled buys at his business located on 2375 Ulric Street.  As part of the operation, undercover officers purchased medication that was only available by prescription.   According to the police report, there were 372 misbranded/illicit pharmaceuticals that he had in stock, and he admitted to knowing that selling prescription drugs were illegal.  Defendant was released on his written promise to appear on Citation 975662 for the violation of Health and Safety Code section 111440 HS, Possess/Sales of misbranded drugs and 11352.1 (B) HS Sale of Prescription Drugs/Dangerous Drugs [San Diego Sheriff Office (SDSO) case No. 19-108532].

Second is Defendant's claim that he's never claimed to be a United States citizen on any document.  But Defendant purchased firearms in 2015 and 2016 while claiming to be a United States citizen.  And on one of those ATF forms – he even claimed that he was born in San Diego.  Defendant admitted in an immigration hearing to purchasing both of those firearms, listed on the ATF transactions forms as a Smith & Wesson .38 Special caliber revolver and a Smith & Wesson 9mm Luger caliber pistol in 2016. Nevertheless, he lied on both ATF firearm purchase forms and lied on his Form I-485 to adjust his status.   In his post-*Miranda* interview proceeding his appearance on the 912 offense, Defendant claimed that he had no access to firearms even though (1) he purchased two firearms, (2) there was ammo corresponding to those firearms at his place of business, and (3) he is pictured in recent photographs with what appears to be high-powered rifles.

Defendant's Form I-485 is riddled with lies.  For example, Question 77 states, "Have you EVER entered the United States without being inspected and admitted or paroled?" Defendant marked "No." However, on form I-700 dated November of 1988, Defendant admitted to entering the United States without a visa at a place other than a port of entry. On form I-130 from March of 1999, the form listed ALVAREZ' last date of arrival in the United States as "1988," and manner of arrival as "210 PENDING."

On form I-765 dated June of 2002, ALVAREZ admitted to entering the United States in 1988 without inspection.

Given his lack of status in the United States and his willingness to lie to challenge that status, Defendant poses a significant flight risk in that he has a great incentive to flee and a willingness to deceive government authorities (repeatedly)

### C. Defendant Knowingly Possessed Firearms while Being a Prohibited Person

Judge Leshner was not aware of the evidence relating to the firearms at the time of Defendant's first detention hearing on the Section 912 complaint. For this offense, Defendant faces a significantly greater guidelines exposure than impersonating a border patrol agent. There is a greater incentive to flee for that reason.

Moreover, Defendant poses a danger to the community. The government has recovered one firearm that Defendant is known to possess: a 9mm Glock, Serial number ZAF67, consensually provided to the government by Defendant's nephew (by marriage to Defendant's niece). Nevertheless, the government does not know the location of two additional firearms that Defendant admitted to purchasing, which he did so illegally by lying about his citizenship. Moreover, the government recently found ammo that corresponds to both of those firearms at Defendant's place of business. The government intends to charge Defendant for possessing this ammunition. The weight of the evidence for the current gun charge is strong: text messages and video corroborate Defendant's possession of the gun lent to him by his nephew.



Defendant is not allowed to own a firearm, and he knows it. Defendant had to lie about his citizenship status to purchase them in 2015 and 2016. In a communication with his nephew in February 2025 in which Defendant discusses shooting the charged Glock firearm, Defendant expresses concern about an immigration checkpoint on the way to his property. Defendant even uploaded a video of himself commenting on how he would be put in jail for taking firearms on a plane since he is not a resident. Defendant nevertheless flew to Texas in June 2025, rented a gun at a range in Houston, and sent a video showing the results of his time at the range to his nephew. This incident is the subject of an active matter with the Southern District of Texas.

Defendant's phone includes recent photographs of him possessing high powered firearms (an AK-47 and an AR-type firearm) while wearing a hat that appears to say "Police." Agents know from the water tank in the background of the pictures that these photos were taken at Defendant's property in Jacumba, California, where he is known to shoot firearms.







Of great concern is that the government does not know where these guns are. Defendant cannot transfer those guns legally.   Jail calls revealed that Defendant attempted to get rid of at least one gun, referring to it in code as a "slingshot" and asking the individual on the other end to get rid of the "slingshot" and to turn off the cameras at his business.  Of course, Defendant had ammunition stored at that business.

There is a significant probability that if granted release, Defendant will seek to possess and/or destroy firearms or any ammo he is believed to possess.  Defendant has already secured the destruction of evidence.  The government did not recover the firearms Defendant admitted to purchasing in either Defendant's home or his business. The government will be unlikely to track any illicit firearm transfers.  The fact that these firearms are already unaccounted for poses a significant danger to the government and to the community.  Defendant is restricted to living in San Diego County by his conditions of release.  Allowing Defendant release from federal criminal custody greatly exacerbates the potential that he will either illicitly possess firearms while engaging in impersonation activity or illicitly transfer or hide these firearms in the community.

**D. Defendant Faces Greater Punishment Because of the New Charges**

The 18 U.S.C. Section 912 charge carries a maximum penalty of three years in prison and a guidelines sentence of 0-6 months.  The incentives are now drastically different.  Defendant now faces statutory maximums of 10 years in prison for both the Section 1546(a) and 922(g)(5) offenses.

Prior to any downward departures or variances, Defendant is looking at 10-16 months for the firearms possession offense.  As noted, Defendant may face charges in the Southern District of Texas. Any plea will require a global resolution between this District and the Southern District of Texas.

### III.    CONCLUSION

Based on foregoing facts and analysis, there is no condition or combination of conditions that can reasonably ensure Defendant will appear for Court.  Moreover, Defendant's possession of firearms and ammunition—all while engaged in federal law enforcement impersonation activity— shows that he is a danger to the community under a clear and convincing standard.

Defendant should be detained.

DATED: March 16, 2026                        Respectfully submitted,

                                             ADAM GORDON
                                             United States Attorney

                                             *s/ Siddharth Dadhich*
                                             SIDDHARTH DADHICH
                                             Assistant United States Attorney